# EXHIBIT A



## MILLER & MARTIN PLLC

**ATTORNEYS AT LAW**

🖿 **FILE COPY**

Suite 1000 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402-2289
(423) 756-6600
Fax (423) 785-8480

John R. Bode
Direct Dial (423) 785-8320
Direct Fax  (423) 321-1507
jbode@millermartin.com

May 22, 2007

**VIA FACSIMILE (619-557-6358)**
**AND U.S. MAIL**

Ms. Tirza P. Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, Ninth Floor
Los Angeles, CA  90017-5449

Re:  Case 21-CA-37682

Dear Ms. Castellanos:

Coca-Cola Bottling Company of San Diego ("Company") offers the following statement of position with respect to the above charge filed by Teamsters Local 683 ("Local 683").  The charge summarily asserts that the Company failed to engage in bargaining regarding the opening of a new facility, delayed responding to requests for information related to that facility, and/or refused to hire employees for that facility because of their union affiliation.

## I.    BACKGROUND

Local 683 represents certain employees working at a production/sales facility in San Diego, California.  The parties' current collective bargaining agreement became effective on May 3, 2004, and will remain in force through May 2, 2009.

## II.    OCEANSIDE FACILITY

In an effort to better serve the existing and future customer base in and around Oceanside, California, the Company recently built a distribution center in Oceanside.  Oceanside is located approximately 40 miles north of San Diego.

## III.    DISCUSSIONS

Although the function of a distribution center varies significantly from the function of a production/sales facility and although the opening of a new distribution center in Oceanside was not motivated by labor costs (see Dubuque Packing Co., 303 NLRB 386 (1991)), the Company initiated discussions with Local 683 regarding the center and its effect, if any, on the existing bargaining unit

Ms. Tirza P. Castellanos
May 22, 2007
Page 2

employees in San Diego. During the period addressed in the instant charge, the parties, in fact, met in sessions on September 20; December 21; January 11; January 22-23; February 1-2; February 8-9; February 28 – March 1; March 8; and April 18-19.

Throughout this period, Local 683 has been provided with a wealth of information concerning the Oceanside facility, and requests for relevant information have been satisfied in a timely fashion. Regarding the information referenced in items 5 and 6 of the particulars recently offered, the same was furnished to Local 683 over a month ago.

As part of these discussions, employees in the existing bargaining unit in San Diego have been encouraged to apply for available positions in the Oceanside facility, if interested. Completing online applications and participating in interviews represent nothing more than standard company protocols. Of the 32 bargaining-unit employees in San Diego who expressed an interest in working in the Oceanside facility, 27 were offered a position. Regarding Tomas Otañez (referenced in the particulars recently offered), his application was rejected following a review of his discipline history, including a written warning for unprofessional conduct in July of 2006 and numerous prior verbal warnings, coupled with his lack of the required license.

The wage structure and benefits associated with the available positions in the Oceanside facility were covered, with internal and external candidates alike, during the interview/hiring process. Additionally, with respect to any internal candidates, multiple meetings were held in the San Diego facility in early December of 2006 in which wage structure and benefits information was addressed in appropriate detail. Class A licenses were/are required of all applicants, internal and external, seeking placement as a driver in Oceanside.

IV.    MISCELLANEOUS ASSERTIONS

The Company denies conditioning, impliedly or otherwise, the employment/continued employment of any employee on his/her rejection of Local 683, or directing any employee to refuse all contact with Local 683.

In an effort to resolve a number of pending grievances, the Company did offer for Local 683's consideration terms for a "global settlement" at a meeting on February 2, 2007. After the union's rejection of that proposal, the same was withdrawn, and effects bargaining continued. The effects bargaining has never been conditioned on any "barring" of employee access to Board procedures. See In re Providence Journal Co., 2003 WL 1883593 (NLRB Div. of Judges, 2003 (mere proposal of settlement offer containing release/waiver provisions within the context of negotiations is not violative of the Act).

3820719_1.DOC

Ms. Tirza P. Castellanos
May 22, 2007
Page 3

V.    <u>CONCLUSION</u>

As shown above, the Company has satisfied its bargaining obligations regarding the opening of the new facility in Oceanside, California; has responded, in an appropriate fashion, to all requests for relevant information relating to that facility; and has administered its hiring practices for that facility without regard to union affiliation.

As always, if the Company can be of any further assistance with respect to your investigation in this matter, please advise. As previously mentioned, Brian Sasadu, former Director of Labor Relations, West Business Unit, could be made available for a further statement, if warranted.

With best wishes,

John R. Bode

JRB:dst

cc:    Warren Nelson, Esq.

3820719_1.DOC

```
***********************
***   TX REPORT   ***
***********************


TRANSMISSION OK

TX/RX NO                0096
RECIPIENT ADDRESS       24464#16195576358
DESTINATION ID
ST. TIME                05/22 16:54
TIME USE                01'51
PAGES SENT              3
RESULT                  OK
```



## MILLER & MARTIN PLLC

**ATTORNEYS AT LAW**

Suite 1000 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402-2289
(423) 756-6600
Fax (423) 785-8480

John R. Bode
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

May 22, 2007

**VIA FACSIMILE (619-557-6358)**
**AND U.S. MAIL**

Ms. Tirza P. Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, Ninth Floor
Los Angeles, CA  90017-5449

    Re:  <u>Case 21-CA-37682</u>

Dear Ms. Castellanos:

    Coca-Cola Bottling Company of San Diego ("Company") offers the following statement of position with respect to the above charge filed by Teamsters Local 683 ("Local 683").  The charge summarily asserts that the Company failed to engage in bargaining regarding the opening of a new facility, delayed responding to requests for information related to that facility, and/or refused to hire employees for that facility because of their union affiliation.

### I.     BACKGROUND

    Local 683 represents certain employees working at a production/sales facility in San Diego, California.  The parties' current collective bargaining agreement became effective on May 3, 2004, and will remain in force through May 2, 2009.

### II.     OCEANSIDE FACILITY

# EXHIBIT B





## MILLER & MARTIN PLLC
### ATTORNEYS AT LAW

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
(423) 756-6600
FAX (423) 785-8480

John R. Bode
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

May 22, 2007

**VIA FACSIMILE (619-557-6358)**
**AND U.S. MAIL**

Ms. Tirza P. Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, Ninth Floor
Los Angeles, CA 90017-5449

    Re:  Case 21-CA-37683

Dear Ms. Castellanos:

Coca-Cola Bottling Company of Southern California ("Company") offers the following statement of position with respect to the above charge filed by Teamsters Local 952 ("Local 952"). The charge summarily asserts that the Company failed to engage in bargaining regarding the opening of a new facility, delayed responding to requests for information related to that facility, and/or refused to hire employees for that facility because of their union affiliation.

### I.    BACKGROUND

Local 952 represents certain employees working at sales centers in Rancho Cucamonga and Orange, California. The parties' current collective bargaining agreement became effective on April 4, 2005, and will remain in force through April 3, 2010.

### II.    OCEANSIDE FACILITY

In an effort to better serve the existing and future customer base in and around Oceanside, California, the Company recently built a distribution center in Oceanside. Oceanside is located approximately 80 miles from Rancho Cucamonga and approximately 65 miles from Orange.

### III.    DISCUSSIONS

Although the opening of a new distribution center in Oceanside was not motivated by labor costs (see Dubuque Packing Co., 303 NLRB 386 (1991)), the Company initiated discussions with Local 952 regarding the center and its effect, if

Ms. Tirza P. Castellanos
May 22, 2007
Page 2

any, on the existing bargaining unit employees in Rancho Cucamonga and Orange. During the period addressed in the instant charge, the parties, in fact, met in sessions on October 5; December 21; January 11; January 22-23; February 1-2; February 8-9; February 28 – March 1; March 8; and April 18-19.

Throughout this period, Local 952 has been provided with a wealth of information concerning the Oceanside facility, and requests for relevant information have been satisfied in a timely fashion. To the extent there was any delay in the furnishing of information prior to the parties' first meeting (a conclusion that the Company does not accept), the same resulted in no prejudice to Local 952's position in light of the multiple sessions that occurred thereafter. In general, the Company has endeavored, at all times pertinent, to furnish Local 952 with information relevant to the Oceanside facility as soon as the same has become available.

As part of these discussions, employees in the existing bargaining units in Rancho Cucamonga and Orange have been encouraged to apply for available positions in the Oceanside facility, if interested. Completing online applications and participating in interviews represent nothing more than simple, standard protocols. Of the 16 bargaining-unit employees in Rancho Cucamonga and Orange who expressed an interest in working in the Oceanside facility, 9 were offered a position. Of the remaining 7 employees, 5 voluntarily withdrew from the application process prior to its completion.

The wage structure and benefits associated with the available positions in the Oceanside facility were covered, with internal and external candidates alike, during the interview/hiring process. Additionally, with respect to any internal candidates, multiple meetings were held in the Rancho Cucamonga and Orange facilities in early December of 2006 in which wage structure and benefits information was addressed in significant detail. Class A licenses were/are required of all applicants, internal and external, seeking placement as a driver in Oceanside.

IV.    MISCELLANEOUS ASSERTIONS

The Company denies conditioning, impliedly or otherwise, the employment/continued employment of any employee on his/her rejection of Local 952, or directing any employee to refuse all contact with Local 952.

In an effort to resolve a number of pending grievances, the Company did offer for Local 952's consideration terms for a "global settlement" at a meeting on February 2, 2007. After the union's rejection of that proposal, the same was withdrawn, and effects bargaining continued. The effects bargaining has never been conditioned on any "barring" of employee access to Board procedures. See In re Providence Journal Co., 2003 WL 1883593 (NLRB Div. of Judges, 2003) (mere proposal of settlement offer containing release/waiver provisions within the context of negotiations is not violative of the Act).

3820706_1.DOC

Ms. Tirza P. Castellanos
May 22, 2007
Page 3

V.    <u>CONCLUSION</u>

As shown above, the Company has satisfied its bargaining obligations regarding the opening of the new facility in Oceanside, California; has responded, in an appropriate fashion, to all requests for relevant information relating to that facility; and has administered its hiring practices for that facility without regard to union affiliation.

As always, if the Company can be of any further assistance with respect to your investigation in this matter, please advise. As previously mentioned, Brian Sasadu, former Director of Labor Relations, West Business Unit, could be made available for a further statement, if warranted.

With best wishes,

John R. Bode

JRB:dst

cc:    Warren Nelson, Esq.

```
***********************
***   TX REPORT   ***
***********************


TRANSMISSION OK

TX/RX NO              0097
RECIPIENT ADDRESS     05705#16195576358
DESTINATION ID
ST. TIME              05/22 17:18
TIME USE             01'52
PAGES SENT              3
RESULT                OK
```



**MILLER & MARTIN** PLLC

ATTORNEYS AT LAW

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
(423) 756-6600
FAX (423) 785-8480

John R. Bode
Direct Dial (423) 785-8320
Direct Fax  (423) 321-1507
jbode@millermartin.com

May 22, 2007

**VIA FACSIMILE (619-557-6358)**
**AND U.S. MAIL**

Ms. Tirza P. Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, Ninth Floor
Los Angeles, CA  90017-5449

   Re:  Case 21-CA-37683

Dear Ms. Castellanos:

   Coca-Cola Bottling Company of Southern California ("Company") offers the following statement of position with respect to the above charge filed by Teamsters Local 952 ("Local 952").  The charge summarily asserts that the Company failed to engage in bargaining regarding the opening of a new facility, delayed responding to requests for information related to that facility, and/or refused to hire employees for that facility because of their union affiliation.

## I.    BACKGROUND

   Local 952 represents certain employees working at sales centers in Rancho Cucamonga and Orange, California.  The parties' current collective bargaining agreement became effective on April 4, 2005, and will remain in force through April 3, 2010.

# EXHIBIT C





# MILLER &MARTIN PLLC
## ATTORNEYS AT LAW

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
(423) 756-6600
FAX (423) 785-8480

**John R. Bode**
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

June 11, 2007

VIA FACSIMILE (213) 894-2778
AND U.S. MAIL

Ms. Tirza Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, 9th Floor
Los Angeles, CA  90017-5449

> Re:     Case No. 21-CA-37682
> Case No. 21-CA-37683

Dear Ms. Castellanos:

I am in receipt of your correspondence dated May 31, 2007 requesting additional information in the above-referenced matters. Set forth below is additional information responsive to the Board's requests:

1. At the present time, there are 38 warehouse positions located at the Oceanside, California facility.

2. At the present time, there are 44 delivery positions at the Oceanside facility.

3. A total of 20 incumbent employees from the Rancho Cucamonga, Orange, and San Diego facilities were scheduled for interview for warehouse positions at Oceanside. One applicant withdrew his name from consideration during the hiring process, and one individual was rejected based upon his interview. Offers of employment at the Oceanside facility were made to 18 incumbent applicants; of those individuals, 11 accepted the offer, and 7 declined the offer. 11 remain employed as of the date of this letter.

4. A total of 23 incumbent employees from the Rancho Cucamonga, Orange, and San Diego facilities were scheduled for interview for delivery positions at Oceanside. During the hiring process, five applicants voluntarily withdrew their names from consideration. Offers of employment at the Oceanside facility were made to 18 applicants; of those individuals who received job offers, 14 accepted the offer, and 4 declined the offer. 14 remain employed as of the date of this letter.

Ms. Tirza Castellanos
June 11, 2007
Page 2

5. No warehouse positions were relocated from the San Diego, Rancho Cucamonga, or Orange facilities to the Oceanside facility. Rather, new jobs were created in Oceanside in order to service customers out of that location. The creation of new job positions at the Oceanside facility did not result in layoffs or a loss of employment for warehouse employees at the San Diego, Rancho Cucamonga, or Orange facilities.

6. No delivery positions were relocated from the San Diego, Rancho Cucamonga, or Orange facilities to the Oceanside facility. Rather, new jobs were created in Oceanside in order to service customers serviced out of that location. As set forth below in the Company's response to Request No. 9, four full-time delivery employees at the San Diego facility were moved to Extra status under the terms of the collective bargaining agreement at that facility, and one employee was temporarily placed on layoff. Within five weeks of these status changes, however, four of those individuals were returned to their prior status at the San Diego facility.

7. No service routes were relocated from the San Diego, Orange, or Rancho Cucamonga facilities to the Oceanside facility. Certain customer locations, however, previously serviced out of these facilities are now serviced by drivers dispatched from Oceanside.

8. No layoffs were conducted at the Rancho Cucamonga or Orange facilities as a result of the opening of the Oceanside facility. Moreover, those employees who elected to remain at the Rancho Cucamonga and Orange facilities have not been transferred to other departments as a result of the opening of the Oceanside facility.

9. As set forth in the affidavit of Brian Sasadu, in San Diego four employees were moved to Extra status per the collective bargaining agreement, during which time they remained on the Company payroll, were entitled to benefits, and were called in to work and did in fact work available hours; in addition, one Extra employee was temporarily placed on layoff at the San Diego facility. Within five weeks of these status changes, four of those employees were recalled to their previous status (three to full-time and one to extra status) at the San Diego facility. None of these individuals has transferred to another department as a result of the opening of the Oceanside facility. The remaining individual was terminated due to an unrelated job requirement issue and, as such, was not available to return to regular employment. The termination of that employee was not grieved by the Union.

As indicated in your correspondence of May 31, the Company has previously offered the testimony of Brian Sasadu in an effort to assist with the resolution of this matter. I hope that the foregoing materials serve to confirm the information provided by Mr. Sasadu and to demonstrate that no violation of the Act took place in this situation.

3867689_1.DOC

Ms. Tirza Castellanos
June 11, 2007
Page 3

Thank you for your time and assistance with this matter.  As always, please do not hesitate to contact me if you have additional questions or information concerning the status of this matter.

With best wishes,

John R. Bode

JRB:sdh

Enclosure

3867689_1.DOC

```
                    ***********************
               ***   TX REPORT   ***
                    ***********************


          TRANSMISSION OK

          TX/RX NO             0179
          RECIPIENT ADDRESS    24464#12138942778
          DESTINATION ID
          ST. TIME             06/11 14:51
          TIME USE             02'28
          PAGES SENT              4
          RESULT               OK
```



## MILLER & MARTIN PLLC

**ATTORNEYS AT LAW**

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
(423) 756-6600
FAX (423) 785-8480

John R. Bode
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| **FROM:**  John R. Bode | **DATE:**  June 11, 2007 |
| **PHONE:**  423-756-6600 | **CLIENT-MATTER:**  96060-0259 |

### PLEASE DELIVER AS SOON AS POSSIBLE TO:

| | **RECIPIENT** | **COMPANY** | **FAX NO.** |
|---|---|---|---|
| **TO:** | Ms. Tirza Castellanous | NLRB, Region 21 | 213-894-2778 |

Total number of pages including cover:  4

☐ Original will not follow   ☑ Original will follow

If you do not receive all of the pages, please call:  Dena Talley at (423) 756-6600

Comment:

# EXHIBIT D





**ATTORNEYS AT LAW**

Suite 1000 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402-2289
(423) 756-6600
Fax (423) 785-8480

**John R. Bode**
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

June 11, 2007

<u>VIA FACSIMILE (213) 894-2778</u>
<u>AND U.S. MAIL</u>

Ms. Tirza Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, 9th Floor
Los Angeles, CA  90017-5449

> Re:    <u>Case No. 21-CA-37682</u>
>          <u>Case No. 21-CA-37683</u>

Dear Ms. Castellanos:

In response to your letter (dated May 31, 2007) addressing injunctive relief, it is respectfully submitted that the use of Section 10(j) of the Act would not be appropriate under the charge in issue. It is relatively clear that none of the criteria established in <u>Miller v. California Pacific Medical Center</u>, 9 F.3d 440 (9th Cir. 1994) have been satisfied.

As detailed one pages 1-2 of your May 31 correspondence, the Union alleges that the Company has violated Sections 8(a)(1), (3), and (5) of the Act with respect to the opening of its facility in Oceanside, California by refusing to bargain in good faith, conditioning negotiations upon the union's acceptance of unlawful subjects, failing to provide requested information, and engaging in discrimination during the hiring process. The Company has previously filed detailed responses to the allegations contained in these charges, copies of which are attached hereto as <u>Exhibit A</u>. In summary, though, these responses show that the Company met extensively with the Union regarding the effects of the decision to open the Oceanside facility, responded timely to the Union's requests for information, and hired a substantial number of the incumbent employees who expressed interest in employment at the Oceanside location. The information provided to date demonstrates that no violation of the Act took place with respect to the Oceanside facility, and that dismissal of the Union's claims is warranted at the present time. Under these circumstances, therefore, this matter is certainly inappropriate for injunctive relief.

Ms. Tirza Castellanos
June 11, 2007
Page 2

As set forth in the Section 10(j) Manual User's Guide (issued by the Office of the General Counsel), Section 10(j) relief should be sought only "in situations where, due to the passage of time, the normal adjudicative processes of the Board likely will be inadequate to effectively remedy the alleged violations." Thus, in order to justify Section 10(j) relief, it is imperative that there be a demonstration of "how the alleged violations threaten statutory rights and the public interest while the parties await a final Board order." According to the General Counsel's own guidelines, "[w]hat distinguishes a 10(j) case from other unfair labor practice cases is the threat of remedial failure."

Based on the investigation conducted to date, the likelihood of the charging party succeeding on the merits of this case is, at best, suspect. In addition, in the event of any success on the merits, the availability of traditional remedies (e.g., transfer, back pay) militates against any finding of the requisite irreparable injury. Finally, a balancing of any hardships and/or public interests further belies the need for such extraordinary processes. Miller, 9 F.3d 440; Overstreet v. El Paso Elec. Co., 176 Fed. Appx. 607 (5th Cir. 2006) (internal citations omitted) (Section 10(j) relief is considered an extraordinary remedy, to be used by the Board "only when, in its discretion, an employer or union has committed such egregious unfair labor practices that any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the Act will be frustrated"). Under these circumstances, the present case simply does not present a situation where the extraordinary relief offered by Section 10(j) would be necessary or appropriate.

Under the Miller standards, it is extremely doubtful that the Region would be successful in any attempt to secure a preliminary injunction in Federal Court in this matter. Moreover, the evidence strongly suggests that neither the Unions nor their members suffered irreparable damage due to the opening of the Oceanside facility. Additionally, the Company demonstrated concern, patience and flexibility in its negotiations with the Local Unions in "effects bargaining" in regard to Oceanside.

During the taking of his affidavit, Brian Sasadu provided the Region with detailed descriptions of the 15 negotiation sessions that he and other management representatives held with Teamsters Business Agents. He described and provided documentary evidence of the Company's diligent efforts to provide all relevant and requested information to the Unions in a timely fashion. He described the Company's efforts to reach a comprehensive settlement with the Union regarding the effects of the opening of the Oceanside facility.

Additionally, during the taking of that same affidavit, Mr. Sasadu gave objective quantified information regarding the staffing of the Oceanside facility. The opening had relatively insignificant effects on the hours, wages, continued employment and other working conditions of members of the pre-existing/certified bargaining units represented by Teamsters 952 and 683.

3867600_2.DOC

Ms. Tirza Castellanos
June 11, 2007
Page 3

From the information he provided, the Region can determine that neither the Union nor its members have faced severe hardships due to the opening of the Oceanside facility. No employees assigned to facilities in the Los Angeles area were laid off. Only four (4) employees in San Diego were subjected to a change in Full Time status (moved to Extra status where they still received hours and benefits) and only one (1) employee was laid off. Four of those five were returned to their previous status within five weeks.

Finally, the public interest would not be served by granting any "preliminary relief" in this matter. The Company has built and staffed an 80,000 square foot distribution center in Northern San Diego County. The Company is serving an expanding customer base in Southern California while providing employment opportunities for area residents. The Company, in cooperation with the Union, has also taken substantial care to provide continued employment opportunities to existing Los Angeles area and San Diego Teamsters/bargaining unit members. The public interest would not be served if the Region sought to disrupt the employment of newly hired, or recently transferred Oceanside employees or the operations of the Company.

Under these circumstances, the present case simply does not present a situation where the extraordinary relief offered by Section 10(j) would be necessary or appropriate. In the event that the Region is provided with any allegations or case law that would suggest a contrary analysis, please advise. The Company would appreciate the opportunity to respond to the same in further detail.

With best wishes,

John R. Bode

JRB:sdh

Enclosures

3867600_2.DOC

```
**********************
***   TX REPORT   ***
**********************

TRANSMISSION OK

TX/RX NO              0178
RECIPIENT ADDRESS     29358#12138942778
DESTINATION ID
ST. TIME              06/11 14:48
TIME USE              02'05
PAGES SENT            4
RESULT               OK
```

# MILLER & MARTIN
### PLLC

**ATTORNEYS AT LAW**

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
(423) 756-6600
Fax (423) 785-8480

**John R. Bode**
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

---

## FACSIMILE TRANSMITTAL SHEET

| | | | |
|---|---|---|---|
| FROM: | **John R. Bode** | DATE: | **June 11, 2007** |
| PHONE: | **423-756-6600** | CLIENT-MATTER: | **96060-0259** |

### PLEASE DELIVER AS SOON AS POSSIBLE TO:

| | **RECIPIENT** | **COMPANY** | **FAX NO.** |
|---|---|---|---|
| TO: | **Ms. Tirza Castellanous** | **NLRB, Region 21** | **213-894-2778** |

Total number of pages including cover:  4

☐ Original will _not_ follow   ☑ Original will follow

If you do not receive all of the pages, please call:   Dena Talley at (423) 756-6600

Comment:

# EXHIBIT E



## MILLER & MARTIN PLLC
### ATTORNEYS AT LAW

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
(423) 756-6600
FAX (423) 785-8480

John R. Bode
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

July 9, 2007

<u>VIA FACSIMILE (213) 894-2778</u>

Ms. Tirza P. Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, Ninth Floor
Los Angeles, CA  90017-5449

Re:    <u>BCI Coca-Cola Bottling Co., Case Nos. 21-CA-37682 and 21-CA-37683</u>

Dear Tirza:

Regarding your letter of June 27, 2007, let me first say that I unfortunately did not receive a voicemail message from you on June 13, 2007 relating to the decision bargaining issue. This is not to say that you did not attempt to leave such a message; I simply did not receive one. That said, you are nevertheless correct in your assessment of the employer's position – the decision to construct a new facility in Oceanside, California was <u>not</u> motivated by labor costs. As such, neither of the unions in issue could have offered labor costs concessions that would have changed that decision.

Once again, the decision to build a multi-million dollar distribution center in Oceanside was motivated by the desire to better serve the existing and, more importantly, future customer base in an area undergoing impressive growth in both population and commercial development. Simply put, it was believed that servicing this particular area from a more centrally-located facility would offer significant improvements and advantages in customer relations and market penetration. Prior to the center's construction, the closest company presence to this area was either 80/65 miles to the north (in Rancho Cucamonga/Orange) or 40 miles to the south (in San Diego). Additionally, it was believed that the construction of a new distribution center in Oceanside would relieve warehouse overcapacity issues confronted in the preexisting facilities. Finally, it was believed that by the opening of a new facility in Oceanside, the preexisting facilities' efforts and resources could be better directed to the service of those areas in which they were more centrally located. In fact, the absence of any subsequent layoffs in the Rancho Cucamonga and Orange facilities, coupled with only a minimal and temporary reduction in the San Diego facility, confirms the accuracy of that belief.

3951352_1.DOC

Ms. Tirza Castellanos
July 9, 2007
Page 2

In addition, as previously explained, the decision to construct a new distribution center was hardly a secret to either Local 952 or Local 683. Both unions were aware of the contemplated action and numerous meetings were conducted, and much information was exchanged, between the parties. <u>See</u> Position Statements of May 22, 2007, Supplemental Statement of June 11, 2007, Affidavit of Brian Sasadu. At no point throughout this process did either union proffer any labor costs concessions or even broach the subject of such concessions – knowing full well that the employer's decision was not motivated by that factor. In fact, the wage and benefit package currently available to employees at the Oceanside facility is substantially equivalent to the packages available at the preexisting facilities, further confirming that neither union could have offered any concessions that would have changed the decision.

Regarding your requested clarification relating to the transfer/relocation of work, I am admittedly a bit confused. The employer concedes (and has never denied) that there are existing customers who are currently served out of the Oceanside facility, who were previously served out of the Rancho Cucamonga, Orange and San Diego facilities. I hope this clarifies the issue. If not, please advise.

Finally, regarding your request for information regarding the boundaries of the territory serviced by the Oceanside facility, the same was furnished to the respective unions sometime ago. Again, after the opening of the Oceanside facility, it was envisioned that the Orange facility would deliver to customers north of the line from the Pacific Ocean, Crown Valley Parkway to Golden Lantern; Golden Lantern to Paseo de Colinas; Paseo de Colinas to 405 Fwy.; and Avery Parkway. Regarding the Rancho Cucamonga facility, it was envisioned that deliveries would be made to customers north of the line from west of I-15 from Lake St. and south; east of I-15 from Nicholas St.; Hwy. 74 from I-15 to Riverside St.; McCall Blvd. from Goetz to Manifee St.; Menifee St. to Simpson to Leon to Newport; and east from that area to points just above Anza. Regarding the San Diego facility, attached please find maps of the expected coverage areas.

Tirza, if Warren or I can be of any further assistance to your investigation of this matter, please do not hesitate to call. Thank you for your continued consideration of the employer's position.

With best wishes,

John R. Bode
John R. Bode
by dst
(w/permission)

JRB:dst

cc:  Warren Nelson, Esq.

3951352_1.DOC



Current San Diego Branch Territory



San Diego Post-realignment

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO                0259
RECIPIENT ADDRESS       06334#12138942778
DESTINATION ID
ST. TIME                07/09 18:24
TIME USE                04'06
PAGES SENT                 4
RESULT                  OK
```



**MILLER &MARTIN**
PLLC
**ATTORNEYS AT LAW**

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
(423) 756-6600
FAX (423) 785-8480

**John R. Bode**
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

July 9, 2007

<u>VIA FACSIMILE (213) 894-2778</u>

Ms. Tirza P. Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, Ninth Floor
Los Angeles, CA 90017-5449

  Re: <u>BCI Coca-Cola Bottling Co., Case Nos. 21-CA-37682 and 21-CA-37683</u>

Dear Tirza:

  Regarding your letter of June 27, 2007, let me first say that I unfortunately did not receive a voicemail message from you on June 13, 2007 relating to the decision bargaining issue. This is not to say that you did not attempt to leave such a message; I simply did not receive one. That said, you are nevertheless correct in your assessment of the employer's position – the decision to construct a new facility in Oceanside, California was <u>not</u> motivated by labor costs. As such, neither of the unions in issue could have offered labor costs concessions that would have changed that decision.

  Once again, the decision to build a multi-million dollar distribution center in Oceanside was motivated by the desire to better serve the existing and, more importantly, future customer base in an area undergoing impressive growth in both population and commercial development. Simply put, it was believed that servicing this particular area from a more centrally-located facility would offer significant

# EXHIBIT F



## MILLER & MARTIN
#### PLLC
### ATTORNEYS AT LAW

Suite 1000 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402-2289
(423) 756-6600
Fax (423) 785-8480

**John R. Bode**
Direct Dial (423) 785-8320
Direct Fax  (423) 321-1507
jbode@millermartin.com

July 19, 2007

**VIA FACSIMILE (619-557-6358)**

Ms. Tirza P. Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, Ninth Floor
Los Angeles, CA  90017-5449

    Re:  <u>Case 21-CA-37682 and Case 21-CA-37683</u>

Dear Tirza:

    In response to your e-mail transmission of July 16, 2007, please be advised that information regarding the number of internal applicants from the San Diego, Rancho Cucamonga, and Orange facilities for positions in the Oceanside facility, was initially provided to Local 683 and Local 952 in Brian Sasadu's letter dated May 23, 2007.  It is my understanding that a copy of that letter may already be in the region's file.  As referenced therein, there were, at that time, a total of 48 internal, bargaining-unit employees who applied for positions in Oceanside.  Of that number, thirty-two were from San Diego; nine were from Rancho Cucamonga; and seven were from Orange.  As noted in Mr. Sasadu's letter, six of those applicants ultimately withdrew from the application process.

    Since May 23, 2007, an additional 3 internal applications have been received – two from Rancho Cucamonga and one from San Diego.

    As always, if Warren or I can be of any further assistance in your investigation of these matters, please do not hesitate to call.

        With best wishes,

        John R. Bode

JRB:dst

cc:   Warren Nelson, Esq. (via facsimile)

01/19/2001 15:26 FAX

```
***********************
***   TX REPORT   ***
***********************

TRANSMISSION OK

TX/RX NO                0300
RECIPIENT ADDRESS       29358#16195576358
DESTINATION ID
ST. TIME                07/19 15:25
TIME USE                00'48
PAGES SENT              1
RESULT                  OK
```



# MILLER & MARTIN
### PLLC
### ATTORNEYS AT LAW

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
(423) 756-6600
FAX (423) 785-8480

John R. Bode
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

July 19, 2007

**VIA FACSIMILE (619-557-6358)**

Ms. Tirza P. Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, Ninth Floor
Los Angeles, CA 90017-5449

Re:  Case 21-CA-37682 and Case 21-CA-37683

Dear Tirza:

In response to your e-mail transmission of July 16, 2007, please be advised that information regarding the number of internal applicants from the San Diego, Rancho Cucamonga, and Orange facilities for positions in the Oceanside facility, was initially provided to Local 683 and Local 952 in Brian Sasadu's letter dated May 23, 2007. It is my understanding that a copy of that letter may already be in the region's file. As referenced therein, there were, at that time, a total of 48 internal, bargaining-unit employees who applied for positions in Oceanside. Of that number, thirty-two were from San Diego; nine were from Rancho Cucamonga; and seven were from Orange. As noted in Mr. Sasadu's letter, six of those applicants ultimately withdrew from the application process.

Since May 23, 2007, an additional 3 internal applications have been received – two from Rancho Cucamonga and one from San Diego.

As always, if Warren or I can be of any further assistance in your investigation

# EXHIBIT G

## Dena Talley

| | |
|---|---|
| **From:** | John Bode |
| **Sent:** | Thursday, August 02, 2007 11:00 AM |
| **To:** | Tirza.Castellanos@nlrb.gov |
| **Cc:** | Warren Nelson |
| **Subject:** | Case 21-CA-37682 and Case 21-CA-37683 |
| **Attachments:** | San Diego CBA_001.pdf; Rancho_Orange CBA_001.pdf |

Tirza,

As follow-up to your July 26, 2007 e-mail, the following is offered for the region's consideration in the above-referenced matters.  As always, if you have any questions or comments regarding this information, or need further clarification, please do not hesitate to contact me or Warren. I have reproduced your email below for convenience.

1. At Oceanside, the Company self insures the medical benefit, and costs will depend on the year's experience including local health and expenses. In general, employees receive $600 if they don't elect coverage. If they do elect coverage, they would pay between $18.48 to $128.73 on a bi-weekly basis depending on the level of coverage elected.

2. For San Diego, the Company also self insures and costs depend on the same factors as described above. Attached is the relevant portion of the San Diego CBA which sets out the various election options. For Rancho Cucamonga and Orange, the bargaining-unit employees participate in a Teamster-sponsored plan.  Attached is the relevant relevant portion of the CBA for Rancho Cucamonga and Orange which indicates that the Company paid $578 per employee per month in 2005. For 2007, the Company contribution is $699.34 per employee per month.

3. As for your last question, the Company does provide dental benefits at Oceanside, San Diego, Rancho Cucamonga, and Orange.

John

From: Castellanos, Tirza [mailto:Tirza.Castellanos@nlrb.gov]

Sent: Thursday, July 26, 2007 1:08 PM

To: wnelson@laborlawyers.com; John Bode

Subject: Coca Cola Bottling Company

Warren and John,

The Region is currently reviewing the merits of the charges. However, we would like to ask some questions concerning the Oceanside medical benefits.

1. Could you please advise what the Employer's contribution (% or $) per

8/30/2007

month to employees' medical benefits is?

2. What portion does the Employer contribute for the medical plans in

San Diego, Rancho Cucamonga and Orange?

3. Does the Employer provide dental benefits at Oceanside? San Diego,

Rancho Cucamonga, and Orange?

Thank you for your continued cooperation in this investigation.

- Tirza

_____
**John Bode -** Ext. 320
Member
Chattanooga Office

8/30/2007

# AGREEMENT

# BETWEEN

# COCA-COLA BOTTLING COMPANY OF SAN DIEGO

# AND

# TEAMSTERS UNION LOCAL 683

# May 3, 2004 – May 2, 2009

## ARTICLE 20 - HEALTH BENEFITS

### Section 1.  Insurance Plans Offered to Employees

Effective January 1, 2005, eligible employees shall have the option to select from either a Blue Cross-Blue Shield EPO health insurance plan or a Blue Cross-Blue Shield PPO health insurance plan.  Prescription benefits shall be provided through Advance PCS, vision benefits shall be provided through VSP, and dental benefits shall be provided through Met Life.  These benefits shall be offered as a package to employees.

Open enrollment under the plans shall be conducted on a calendar year basis.

### Section 2.  Employee Contributions to Health Insurance

Employee pre-tax contributions per week, regardless of coverage election, shall be as follows:

| 1/1/05 | 7/1/05 | 1/1/06 | 7/1/06 | 1/1/07 | 1/1/08 | 1/1/09 |
|--------|--------|--------|--------|--------|--------|--------|
| $9.50  | $13.00 | $17.00 | $20.00 | $23.00 | $25.00 | $27.00 |

Health Insurance Utilization Co-Pays:

| 1/1/05 | 1/1/06 | 1/1/07 | 1/1/08 | 1/1/09 |
|--------|--------|--------|--------|--------|
| $10    | $10    | $10    | $20    | $20    |

### Section 3.  Opt Out

Employees may only select Company-provided health/vision/dental/prescription benefits as a package deal.  Employees who choose to opt out of coverage shall be paid $600.00 per year, paid incrementally through regular payroll.

### Section 4.  Eligibility for Insurance

An employee is eligible for Company-provided insurance if he:

(a)   is hired as a Full-time employee (as opposed to an Extra employee) and has worked 80 hours or more per month for two (2) consecutive months;

(b)   is converted from Extra employee status to Full-time status; or

(c)   is classified as an Extra employee and has worked 120 hours or more per month for two (2) consecutive months.

Coverage will begin on the first of the month following the date on which the employee meets the eligibility criteria.

An employee who is a participant in Company-provided insurance as of the date of open enrollment for the 1/1/05 insurance year shall remain eligible to participate in the new plan until ineligible under the terms of the new plan.

# AGREEMENT BETWEEN TEAMSTER UNION LOCALS 848, 952 & 986



and

# COCA-COLA BOTTLING COMPANY OF SOUTHERN CALIFORNIA

April 4, 2005 – April 3, 2010

N.     In addition to base plus incentive, Full Service delivery drivers will receive additional compensation based on hours worked or compensated, under the terms of this Agreement over forty (40) hours in a work week. Time off for holidays, or any other such compensated hours, shall be considered as hours worked in arriving at the total number of hours per work week. A regular hourly rate for each base plus incentive delivery driver shall be determined each work week by dividing his total straight time compensation for that work week (base plus incentives) by the total number of hours worked by him or for which he was compensated, in that work week. Each such employee shall then be paid, in addition to his straight time compensation of base plus incentives, one-half (1/2) times such regular hourly rate for all times worked in excess of forty (40) hours in that work week, including all such compensated hours paid for in determining the total number of hours worked.

In year one of the agreement, such overtime rate shall be the greater of the weekly calculated rate as described above or $11.325 per hour. In subsequent years of the agreement the fixed overtime rate shall be adjusted according to the increases to the base portion of the base plus commission compensation.

O.     The regular hourly rate of Full Service delivery drivers working the seventh consecutive day of a workweek shall be determined by dividing the total straight time compensation, (base plus incentive) by the total number of hours worked, or for which he was compensated, in that work week. Each employee shall then be paid, in addition to the straight time compensation of base plus incentive plus one-half (1/2) times such regular hourly rate for all hours in excess of forty worked in the first six (6) consecutive days of the work week, one (1) times his regular hourly rate for all hours worked on the seventh consecutive day.

In year one of the agreement, the sixth consecutive day shall be paid at the greater of $11.325 or the calculated rate as described above. The seventh consecutive day of work shall be paid at the greater of the calculated rate as described in the paragraph above for double time or $15.10 per hour.   In subsequent years of the agreement the fixed overtime rate shall be adjusted according to the increases to the base portion of the base plus commission compensation.

## SECTION 21. HEALTH INSURANCE

A.     The parties hereto agree to continue for the duration of this Collective Bargaining Agreement the existing Trust which is known as the Southern California Soft Drink Industry and Teamsters Health and Welfare Trust Fund, for the purpose of providing the benefits specified herein to employees, retirees and their eligible dependents.

The Trust Fund shall continue to be jointly administered by a Board of Trustees consisting of four (4) members, two (2) appointed by Teamsters Union Locals 896, 848, 952, and 986, and up to two (2) appointed by Coca-Cola Bottling Company of Los Angeles.

21

For the purpose of this Article, an Employee, on whose behalf contributions shall be required, is defined as an employee who has worked or was compensated for eighty (80) straight time hours in the preceding calendar month. Eligibility for employees who voluntarily resign or who are discharged shall cease at the end of the month in which employment terminates.

Company contributions paid under the provisions of the Plan shall be used to provide health and welfare and related benefits to both active and retired participants. The eligibility rules and the level and nature of benefits shall be determined from time to time by the Trustees of the Health and Welfare Trust. Eligibility, benefits levels and the nature of such benefits applicable to active employees and retirees may differ.

B.    Death Benefits and Medical and Hospital Benefits - The Trustees are authorized and directed to continue and expand alternate choice medical and hospital group programs.

Eligible active employees will be given an opportunity once each year, and at other qualifying times as outlined in the plan document to choose between the Plans. Effective no later than August 1, 2005, the HealthNet HMO Plan will not be an available benefit option and all employees currently enrolled in HealthNet HMO will be required to choose the Kaiser HMO Plan or the Indemnity Plan.

New employees will be given the information to choose between the available plans prior to the date they first become eligible for benefits. Failure to choose a plan will result in default to the plan outlined as such in the Summary Plan Description.

C.    Dental Care The Trustees are authorized and directed to continue the existing Indemnity Dental Plan for eligible employees and their dependents as outlined in the Summary Plan Description.

D.    Prescription Benefits - The Trustees are authorized and directed to continue the existing Plan of prescription benefits for eligible employees and their dependents as outlined in the Summary Plan Description.

E.    Vision Care Benefits - The Trustees are authorized and directed to continue the existing Plan of vision care benefit for eligible employees and their dependents as outlined in the Summary Plan Description.

F.    Retirees Medical and Hospital Benefits and Prescription Benefits – The Trustees are authorized and directed to continue the existing Plan of medical, hospital and prescription care benefits for employees who: 1) retire subsequent to July 1, 1969; and 2) are receiving benefits under the Western Conference of Teamsters' Pension Plan; and 3) immediately prior to their retirement were employed for at least five (5) years by an Employer signatory to this Collective Bargaining Agreement or preceding Collective Bargaining Agreement or preceding Collective Bargaining Agreements. The benefits shall apply to eligible retirees, and their eligible spouse and dependents as outlined in the Summary Plan Description.

22

Employees who are about to retire are encouraged to contact the Trust Fund's Administrative office prior to the beginning of their retirement to arrange for participation under the retiree coverage, if so desired.  A selection and co-contribution must be made within thirty (30) days of eligibility or as otherwise directed by the Trustees under the Summary Plan Description.  Employees are responsible to make the proper contacts and arrangements for continuation of coverage.

The benefits shall be integrated to the fullest possible extent with any existing or future Governmental programs which provide for medical, hospital care and/or prescription drug coverage for retirees. All current and prospective retirees shall be obligated to enroll in Part B Medicare in order to qualify for retiree benefits.

Retirees who elect not to make the required self-payments described in the Summary Plan Description shall forfeit their eligibility for retiree benefits and may not participate in the future.

The Trustees shall consider incentive arrangements to encourage participation in cost effective Medicare Risk programs, such as reducing the required self-payment for over age 65 retirees.

G.    The Trustees are authorized and directed to periodically evaluate the prices and quality of services provided by all vendors (e.g. HMOs, UR, PPO, B-MAP, Prescription Drugs, etc.) and bid and replace such vendors as deemed appropriate.  Benefit reimbursement from the Trust shall be coordinated with other group plans such that the total benefit payable from all plans to the eligible participant shall not exceed the benefit payable from this Trust in the absence of other coverage.

Maintenance of Benefits — The contributions for all of the above benefits and the benefits and administration costs there of shall be maintained in the accounts of the Trust Fund. The trustees are authorized and directed to establish necessary reserves for the benefits provided in this Article and to invest such reserves in accordance with professional advice.

Funding and Cash Reserve.    Effective with hours worked in April 2005 (paid in May 2005) and May 2005 (paid in June 2005) the Company will contribute $500.00 per month for each employee who works eighty (80) or more straight-time hours. Effective with hours worked in June 2005 (which are payable in July 2005), the Company will contribute $578.00 per month for each employee who works eighty (80) or more straight-time hours in the preceding calendar month.  This rate includes the $0.45 per hour fixed year one allotment referenced in Section 18 of the Agreement.  In all subsequent years of the Agreement, the Union will provide the Company and the Trustees with the Health Insurance allocation in accordance with Section 18 guidelines.

Employees participating in the Kaiser HMO Plan shall also contribute towards that plan via paycheck deductions as follows;

| | |
|---|---|
| Employee: | $10.00 per month |
| Employee +1: | $20.00 per month |
| Employee + Family: | $30.00 per month |

23

Retirees shall continue to contribute towards Health Insurance coverage at the contribution rates in effect as of the date of ratification (as stated below) or as modified by the Southern California Soft Drink Trust;

| | |
|---|---|
| Medicare retiree or spouse: | $50.00 per member per month |
| Non-Medicare retiree or spouse: | $100.00 per member per month |
| Other non-Medicare dependents: | $75.00 per member per month |

During the course of the Agreement, contribution rates as stated above may increase and, therefore, the employee may be subject to increased contributions via payroll deduction as a result.

The Trustees are directed to maintain a cash reserve of not less than two (2) months average cost of operations, and not more than six months average cost of operations during the term of this Agreement. The cash reserve calculation shall be based upon the plan's average expenses (net of insurance refunds) during the preceding twelve month period. If Plan reserves fall below the required amount, the Trustees are instructed to call a special meeting and activate a plan to rectify the matter immediately by modifying benefits or taking increased contributions from employees.

The above contribution rates constitute the Company's maximum contribution obligation during the term of this Agreement. Working within these limitations, the Trustees are directed to manage the plan in such a way that is consistent with the following goals and objectives:

1. Maintain current benefit levels; and
2. Maintain current employee co-payment levels, and
3. Prevent the need for increased employee contributions, if possible

When the Trustees determine that they have attempted to achieve these goals, then the Trustees may manage the reserves to provide for plan contribution relief (through the suspension of or reduction of contributions, or any other method they may agree upon) as long as the reserves remain within the two to six month range.

The Trustees shall inform other participating Employers, the Local Union and Joint Council 42 of these changes 60 days prior to an effective change date.

H.    <u>Acceptance of Trust</u> - The parties hereby accept the terms of the existing Trust and the amendments to that Trust required to accomplish the provisions of this Collective Bargaining Agreement and by this acceptance agree to and become parties to said Trust. Any amendments which from time to time may be made thereto, including the creation of supplementary Trusts to handle any of the Funds referred to in this Agreement, are hereby incorporated by reference and made a part of this Agreement. The parties hereby accept the existing Trustees as Trustees under the Trust Agreement.

I.    The Company agrees to pay the Trustees the contributions provided for herein not later than the tenth (10th) day of the month, on behalf of each employee who has worked or was compensated for eighty (80) straight time hours in the previous calendar month,

an amount necessary as established by the Board of Trustees which is consistent with Paragraph (G) above.

In the event that any legal action or proceeding against the Company is necessary to enforce the payment of any contributions hereunder, the Trustees shall be entitled to recover from such Company all costs incurred in connection therewith, together with all reasonable attorney's fees necessarily incurred in connection therewith.

The parties recognize and acknowledge that the regular and prompt filing of accurate Company reports and the regular and prompt payment of correct Company contributions to the Fund is essential to the maintenance and effect of the Health and Welfare Plan and that it would be extremely difficult, if not impossible, to fix the actual expense and damage to the Fund and to the Health and Welfare Plan which would result from the failure of a Company to make such accurate reports and to pay such accurate monthly contributions in full within the time specified by the Board of Trustees. Therefore, the amount of damage to the Fund and the Health and Welfare Plan resulting from failure to file accurate reports or pay accurate contributions within the time specified shall be presumed to be the sum of fifteen dollars ($15.00) or ten percent (10%) of the amount of the contribution or contributions due, whichever is greater, for each inaccurate or delinquent report or contribution. These amounts shall become due and payable to the Fund as liquidated damages and not as a penalty upon the day immediately following the date on which the report or the contribution or contributions become delinquent. Liquidated damages shall be paid for each delinquent or inaccurate report or contribution and shall be paid in addition to any contributions due. The imposition of the liquidated damages described above shall require affirmative action of the Trustees following examination of periodic delinquency reports from the Administrator.

J.      In the event of legislation providing any benefits which in whole or in part duplicate the benefits provided under the Trust Fund, the Trustees are instructed to review and evaluate the situation and develop a plan of action that is intended to prevent the Company and/or employees from being required to fund the cost of such duplicated benefits. If the Trustees cannot agree on a plan within 30 days of the passage of such laws (federal, state or local) the matter shall be referred to the bargaining parties. If the bargaining parties do not resolve this matter within 60 days of such referral, the Trustees are authorized to resolve this dispute through binding arbitration.

K.      It is the intent of the bargaining parties that the Company contributions required in this Agreement be fully deductible as an ordinary business expense under the Internal Revenue Code and similar State Revenue and Tax laws in the year in which such contributions are made. If the deductible status of such Company contributions change during the term of this Agreement, the Trustees are directed to evaluate and implement a plan, if possible, to maintain the plan of benefits, targeted reserves, and the full deductibility of such contributions. If the Trustees cannot agree on a plan within 30 days of the passage of such laws (federal, state or local) the matter shall be referred to the bargaining parties. If the bargaining parties do not resolve this matter within 60 days of such referral, the Trustees are authorized to resolve this dispute through binding arbitration.

25

# EXHIBIT H



**MILLER &MARTIN**
PLLC
**ATTORNEYS AT LAW**

SUITE 1000 VOLUNTEER BUILDING
832 GEORGIA AVENUE
CHATTANOOGA, TENNESSEE 37402-2289
(423) 756-6600
FAX (423) 785-8480

**John R. Bode**
Direct Dial (423) 785-8320
Direct Fax (423) 321-1507
jbode@millermartin.com

August 31, 2007

**VIA FACSIMILE (619-557-6358)**
**AND FIRST CLASS MAIL**

Ms. Tirza P. Castellanos
Board Agent
National Labor Relations Board
Region 21
888 South Figueroa Street, Ninth Floor
Los Angeles, CA  90017-5449

    Re:  <u>Case 21-CA-37682 and Case 21-CA-37683</u>

Dear Ms. Castellanos:

    As you know, Warren Nelson and I represent the employer in the above-referenced cases.  I write regarding the Region's subpoena duces tecum issued on August 7, 2007.  As you know, the employer filed a petition to revoke the subpoena, and the same is still pending.  The grounds for the subpoena included the lack of relevance and/or the unduly burdensome nature of the requests.  These objections, as well as all others noted in the petition to revoke, still stand.  Nonetheless, as Warren advised you last week, the employer has agreed to produce some documents relating to the factors driving the decision to build the facility in Oceanside, California.

    Enclosed please find an October 2004 PowerPoint presentation which we received from the Company's Supply Chain Planning Group.  This presentation was made to management, in an attempt to explain the need for change, along with recommended actions.  It summarizes the significant amount of research and planning that went into the Oceanside decision.  As you will see, the issues and recommended actions all involved the increasing market demand for product in the area, and the need for more warehouse capacity to meet this demand.  While there are also some notes on the strategic location of Oceanside in the growing "North County" of San Diego, the population growth and commercial development in that area were self-evident.  Again, issues of labor costs were simply not at play in the Oceanside decision.

    Finally, please note that the enclosed document contains much confidential and proprietary information.  Some of it is so sensitive that we have redacted some figures.  The entire document is nonetheless being produced with the understanding

Ms. Tirza P. Castellanos
August 31, 2007
Page 2

that it is confidential and will not be produced to the union or any other third parties. It is produced, as discussed above, to assist the Region in its ongoing investigation.

We thank you for your assistance in this matter. Please do not hesitate to contact me if you have any additional questions.

With best wishes,

John R. Bode

JRB:sdh

Enclosures

cc:  Warren L. Nelson, Esq. (w/encl)

4089734_2.DOC



CONFIDENTIAL

# Southern California
## Summary Review

# October 2004

CONFIDENTIAL

# Growth in Southern California has out paced the rest of North America

- **2003 –**    cases
  - Southern California
  - Rest of NABU

- **2004 YTD – expected**    cases
  - Southern California
  - Rest of NABU



Cases (in MM's)

2001    2002    2003    2004

## CONFIDENTIAL

With the SKU proliferation and package shift, we are currently short of space in Southern California

| Facility | 2004 Est. Distribution | 2004 FP Available[1] | 2004 FP Required | Peak Period Utilization | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
| *Cathedral City | | | | | | | | | |
| *Lancaster | | | | | | | | | |
| *Orange | | | | | | | | | |
| *Ventura | | | | | | | | | |
| *Sylmar | | | | | | | | | |
| *Carson[1] | | | | 128% | | | | | |
| San Diego[1] | | | | 127% | | | | | |
| **Rancho | | | | 125% | 129% | | | | |
| Los Angeles[1] | | | | 121% | 123% | 125% | 127% | 129% | 115% |
| *City Of Industry | | | | 103% | 106% | 108% | 111% | 113% | 126% |
| Las Vegas | | | | 102% | 108% | 113% | 117% | 122% | 104% |
| Bakersfield | | | | 90% | 93% | 96% | 99% | 101% | 94% |
| Downey[1] | | | | 79% | 83% | 86% | 88% | 91% | 79% |
| Santa Maria | | | | 70% | 72% | 74% | 76% | 77% | 79% |
| El Centro | | | | 67% | 69% | 69% | 70% | 71% | 72% |
| Basin | | | | 108% | 111% | 114% | 117% | 120% | 123% |
| Total So. Cal | | | | 109% | 113% | 117% | 119% | 122% | 126% |

*Considers additional space required for drivethru/rework etc.

**Includes Victorville's volume

1 - Footprints adjusted for racks

CONFIDENTIAL

# Several financial indicators highlight these concerns

- Leasing over $     in outside space annually

- Holding cases at Downey causing additional transportation costs of $     YTD

  – Anticipated $     annually

- Higher damage and loss than NABU average by     ¢/case = $



Damage and Loss for So. Cal vs. NABU

So. Cal

NABU Ave.

Cost per Case

$-

1999    2000    2001    2002    2003

Year

CONFIDENTIAL



## The map below indicates how many large facilities are at critical capacity levels today



Facility Type
- ■ Warehouse
- ◆ Crossdock
- ★ Modified Crossdock
- ● Double-bottom
- ▲ Plant

Warehouse Capacity
- ▨ Unknown
- ▨ Acceptable Capacity
- □ At Capacity
- ▨ Critical Capacity

Sales Volume*
- ■ cases
- ■ cases
- ■ cases
- ■ cases
- ▪ cases

CONFIDENTIAL

**The last significant capacity additions were made in 2000/2001 with additions to Downey, Rancho, and Santa Maria**

- Since 2001, the Division has grown by ⸱⸱⸱ cases

- Southern Cal is forecasting growth of another ⸱⸱⸱ cases over 5 years

- ⸱⸱⸱ cases is the equivalent of a 210,000 ft$^2$ sales center or $⸱⸱⸱ of capital

- The current 5 year plan requires for $⸱⸱⸱ in land and building capital
  - $⸱⸱⸱ in buildings
  - An incremental $⸱⸱⸱ in land

CONFIDENTIAL

After examining several scenarios, the following have the best results

<u>2005</u>

- Oceanside – new sales center
  - Reduced scope of 76K ft$^2$